IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **ALEXIS ROSITANO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | CIVIL ACTION NO. 3:20-cv-00420 |
| | ) | |
| **FREIGHTWISE, LLC, and RICHARD** | ) | **Judge Waverly D. Crenshaw, Jr.** |
| **HOEHN, INDIVIDUALLY** | ) | **Magistrate Judge Barbara D. Holmes** |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |
| | ) | |

## ALEXIS ROSITANO'S RESPONSE TO DEFENDANT FREIGHTWISE, LLC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiff, Alexis Rositano ("Rositano"), by and through Counsel, hereby files this Response to FreightWise, LLC's ("FW") Motion to Dismiss, In Part, Rositano's Second Amended Complaint ("Complaint").

FW claims Rositano provides "vague facts, assumptions, and conclusions," regarding FW's liability in this matter. Doc. 35, p. 1. FW avoids considering: 1) whether its status as an LLC may effect its liability for the acts of a member under the Revised Limited Liability Company Act; 2) vicarious liability of supervisory agents under the Restatement (Second) of Agency or Restatement (Third) of Agency, instead treating Defendant Richard Hoehn ("Hoehn") as a run of the mill employee of FW; and 3) whether, given that FW believes it can in good faith make an argument that the workers compensation exclusion applies, that, *vice versa*, Rositano can clearly survive a motion to dismiss on allegations that Hoehn was acting within the scope of his employment, or incidental to his employment at FW at all times, regardless of whether Rositano was acting within the scope of her employment.

As referenced at the outset of Rositano's Complaint, Hoehn is a "member/owner" of FW and acts as FW's CIO/CTO, and directly supervised Rositano after FW hired Rositano as an independent contractor in late December 2018/early January 2019. Doc. 31, ¶¶ 4, 24-32.[1] FW is a "member-managed"[2] LLC, with an initial filing date of September 15, 2017, subject to the Tennessee Revised Limited Liability Company Act. *See* Tenn. Code Ann. § 48-249-1002(a). Per Tenn. Code Ann. § 48-249-402(a)(1), each member of a member managed LLC " . . . is an agent of the LLC for the purpose of its business, and an act of a member . . . that is apparently for carrying on in the ordinary course the LLC's business, . . . binds the LLC, unless the member had no authority

---

[1] FW hired Rositano as a contractor to avoid paying fees to Randstad USA. Doc. 31, ¶¶ 18-32.
[2] *See* Tennessee Secretary of State, Business Entity Detail, available at: FW SOS/

to act for the LLC in the particular matter, and the person with whom the member was dealing knew or had notice that the member lacked authority . . ."

Hoehn admits to an alleged consensual sexual relationship with Rositano. Doc. 27, p. 5. The Complaint clearly alleges that Hoehn acted on behalf of the LLC or otherwise engaged in actions at least incidental to his role as owner/member of the LLC through discussions related to hiring, termination, and promotion, and initiating outside the workplace conversations and drinking, all of which are within the powers of an LLC member per Tenn. Code Ann. § 48-249-401 ("each member has equal rights in the management and conduct of the LLC's business . . ."). Doc. 31, ¶¶ 4, 13, 15, 32. 45, 47, 50. Thus, Rositano submits, as set forth in more detail below, that FW is vicariously liable for Hoehn's acts and FW Motion to Dismiss should be denied.

## I. STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "construe the complaint in the light most favorable to the plaintiff, accept plaintiff's allegations as true, and draw all reasonable inferences in favor of the plaintiff." Woodard v. City of Murfreesboro, No. 3:20-CV-00148, 2020 WL 3546759, at *7 (M.D. Tenn. June 30, 2020) *citations omitted.* A plaintiff only needs to provide a short and plain statement of the claims made in order to give the defendant notice of what the plaintiff's claims are and the grounds upon which the claims are founded. *Id*

The Court does not weigh the evidence in reviewing a motion to dismiss, instead determining whether the plaintiff is "entitled to offer evidence to support the claims . . ." *Id. citations omitted.*[3]

## II. FW's Motion to Dismiss Count IV, Vicarious Liability, Fails.

---

[3] A well-pled complaint should survive a motion to dismiss even where "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Holmes v. Air Line Pilots Ass'n, Int'l, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) *citations omitted.*

FW moves to dismiss Rositano's vicarious liability claim against FW for Hoehn's acts as alleged in Counts I (sexual battery against Hoehn), II (false imprisonment against Hoehn), and III (intentional or negligent infliction of emotional distress ("IIED" or "NIED") against Hoehn.) FW argues these claims are barred against FW under workers' compensation preemption or, alternatively, Tennessee only imposes vicarious liability on employers where the employee, regardless of whether the employee is a president, member, owner, supervisor or janitor of the employer, is acting within the scope of his employment at the place of employment.

This argument is problematic at the Motion to Dismiss stage, as Freightwise affirms to the Court that it can, in good faith and not for an improper purpose, argue that Hoehn and Rositano were acting within the scope of their employment at all times for the purposes of workers' comp exclusivity, while alternatively arguing that Hoehn was never acting within the scope of his employment as it relates to his sexual harassment, IIED, NIED, battery, and false imprisonment of Rositano. Given that FW believes it can in good faith make both arguments, it should be clear that it is a jury question, or at least not a question to be resolved at the Motion to Dismiss stage, whether Hoehn was always or occasionally or never acting within the scope of his employment at FW.

Contrary to FW position, the question of acting in the scope of one's employment or incidental to the scope of one's employment is not as simple as stating either: 1) Rositano and Hoehn both were acting within the scope of employment; or 2) Rositano and Hoehn both were not acting within the scope of employment. Rositano clearly never alleges she was acting within the scope of her employment when Hoehn was texting with her, calling her, or harassing her, as she never anticipated sexual harassment to be within the scope of her employment duties as an invoice pre-processer. Her duties included: 1) reviewing invoices; 2) confirming the bills of lading and proof of delivery match; and 3) uploading the invoices so the "keyers" could do their jobs. Doc. 31, ¶ 20.

Rositano generally processed 2,000 to 3,000 invoices per week. Doc. 31, ¶ 28. As set forth in the Complaint, she stayed, and kept coming back, despite the harassment and the emotional trauma it caused her, because she desperately needed the job, not because she had any interest in Hoehn. Doc. 31, ¶¶ 50-5356, 57, 64, 68, 71-98. As Gracie Sims will testify, Ms. Sims was with Rositano at a bar in Columbia when Hoehn showed up. After he left, Ms. Sims advised Rositano that Hoehn liked Rositano. Ms. Sims recalls that Rositano responded by stating, Hoehn was married, and she would never be with a married man. Doc. 31,¶¶ 58-60.

This demonstrates that Rositano always believed that Hoehn was acting within the scope of his employment, or incidentally to his status as a member/owner of FW, in that she believed Hoehn had the power to terminate her at any time, and therefore sought to stay in his good graces so as to remain employed. Hoehn himself made it a point to present himself as having the power to hire, fire, promote, terminate, or otherwise help Rositano, and in fact claimed to have hired Rositano. Doc. 31, ¶¶ 61, 195, 351. Thus, Rositano could either be friendly while trying to be clear she had no romantic interest in Hoehn (see i.e. Doc. 31, ¶¶ 79-94) or be subject to her boss's wrath, such as the way Hoehn poorly treated Larry Sowards, a co-worker in Rositano's department. Hoehn, for example, presumed Sowards to be gay, stating "even his voice sounds gay." Doc. 31, ¶¶ 39-48.

As set forth below, regardless of whether Hoehn acted in the scope of employment or on behalf of or incidental to FW's business, FW motion to dismiss the vicarious liability claim fails.

**A. Workers Compensation Does Not Bar to Rositano's Claims Against FW.**

In order for an employee's claim to be covered by workers compensation, the employee's injury must "arise out of" and occur "in the course of" employment. Coleman v. St. Thomas Hosp., 334 S.W.3d 199, 204 (Tenn. Ct. App. 2010). "In the course of" refers to whether the " . . . employee was performing a duty he or she was employed to do." *Id.* The "arising out of" requirement refers

to the "causal connection between the conditions under which the work is required to be performed and the resulting injury." *Id.*

This Court, in a case FW refused to discuss in its Motion despite being aware of its existence, stated, "[a]s an initial matter, "[i]f an injury to an employee does not fall within the parameters of the [workers' compensation] *law, then the exclusive remedies provision does not apply." Doe v. Matthew 25, Inc., 322 F. Supp. 3d 843, 851–52 (M.D. Tenn. 2018) *citations omitted.* The Court therefore ruled that injuries arising out of supervisor sexual harassment are not covered by workers' compensation law because those injuries "d[o] not arise out of [the injured employee's] employment," but rather "result[] from conduct that was purely personal between the plaintiff and her supervisor," . . . and "[s]uch a rule reflects Tennessee's policy that "sexual harassment [and associated claims] should not and cannot be recognized as a risk *inherent* in any work environment." *Id. citations omitted.* This Court continued, "Since tort claims arising out of sexual harassment are not covered by the [Tennessee Workers' Compensation Act]," an injured employee's claims "are not covered by the exclusive-remedy provision." *Id. citations omitted.*

Further, in a second, very recent case ignored by FW, the Tennessee Court of Appeals confirmed that claims either fall under the Tennessee Human Rights Act or the Tennessee Workers Compensation Act, not both. Potter v. Yapp USA Auto. Sys., Inc., No. M201901351COAR3CV, 2020 WL 2611681, at *5 (Tenn. Ct. App. May 22, 2020) (stating, "complainants seeking compensation for injuries resulting from sexual harassment must generally file their claims under the THRA, not the TWCA. Moreover, the THRA was designed to provide full compensation to a plaintiff who was a victim of sexual assault, so there should be no need to seek relief under another statute. *Id.* We discern from the holdings in *Anderson* and *Harman* that, contrary to her assertion, Ms. Potter may only recover for the injuries she sustained during the July 6 incident under one of

the acts.) The Tennessee Court of Appeals ruled that where the conduct in question constitutes sexual harassment, "the holding in *Anderson* makes clear that . . . (plaintiff) would not have been able to recover damages under the TWCA because her injuries would not have arisen out of her employment." *Id.*

Despite this clear holding, FW has not sought dismissal of Rositano's THRA or 42 USC 2000e claims, despite claiming that the workers comp act provides the exclusive remedy on tort claims. Nor did FW object to the EEOC process or offer Rositano any workers' compensation benefits. Thus, FW's workers compensation exclusivity defense is clearly barred by case law and any relief requested on this ground should be denied.

Regardless of the clear law set forth in *Potter* and *Doe*, FW has not identified what duty related to employment that Rositano was performing at the time of the ongoing harassment and assault. While Hoehn was clearly acting as a supervisor and discussing promotions, terminations, hiring, etc., and presumably using a cell phone paid for by the LLC, etc. all within the scope of his employment or incidental to his role as a member of the LLC, Rositano was not performing any duty related to her employment. Rositano was paid to process invoices, not respond to text messages, go out for drinks with her boss and coworkers, or answer her phone at all times of day. Further, as made clear in *Potter*, sexual injuries are never a hazard inherent to employment, and are therefore not covered by the workers' compensation act.

## B. Presuming Hoehn Was Acting Outside the Scope of His Employment, FW Remain Liable for Hoehn's Acts Under Tennessee Law.

Tennessee applies the Restatement (Second) of Agency when determining an employer's liability for the acts of an employee. Wallace v. Leidos Innovations Corp., 805 F. App'x 389, 392–93 (6th Cir. 2020). § 219(2) of the Restatement (Second) of Agency states that a

master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: . . . (b) the master was negligent or reckless . . . or . . . (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or (the servant) was aided in accomplishing the tort by existence of the agency relation.

Tennessee courts apply Restatement (Second) of Agency § 219(2) in employment suits under Title VII. *See* Sanders v. Lanier, 968 S.W.2d 787, 790 (Tenn. 1998) (stating, "We believe that, when an employer empowers a supervisor with the ability to take actions that affect the employment status of subordinates, the supervisor's acts taken or threats made within the actual or apparent scope of authority are imputed to the employer . . . Accordingly, respondeat superior is applicable under a quid pro quo theory when: (1) an employer empowers a supervisor with the ability to alter job benefits; (2) the supervisor abuses the empowerment by making a subordinate's job benefits contingent upon receipt of sexual favors; and (3) the subordinate reasonably believes that the supervisor has the actual or apparent authority to alter the subordinate's job benefits."

More importantly, Tennessee courts have recognized that § 219(2) is a permissible method of imposing liability on an employer for an employee's acts outside the scope of employment. *See* Cheatwood v. Curle, No. W200702204COAR3CV, 2008 WL 2687618, at *2 (Tenn. Ct. App. July 7, 2008) at fn. 4 (stating, "There are also instances in which an employer may be liable for the tort of an employee even though it was committed outside the scope of the employee's employment. *See* Restatement (Second) of Agency § 219(2) (1958); cf. McReynolds v. McReynolds, No. 01-A-019109CV00315, 1992 WL 14127, at *2 (Tenn. Ct. App. Jan. 31, 1992).) In *McReynolds*, the Court reviewed Restatement (Second) of Agency §§ 219(2), 261, 262, and, in applying such law, found that the agency relationship did not enable the defendant to defraud a third party under the facts of the case. McReynolds v.

McReynolds, No. 01-A-019109CV00315, 1992 WL 14127, at *2 (Tenn. Ct. App. Jan. 31, 1992).

Restatement (Second) of Agency § 261, titled "Agent's Position Enables Him to Deceive", states, "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Restatement (Second) of Agency § 262, titled "Agent Acts for His Own Purposes", states, "A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this."

The Sixth Circuit, applying Tennessee law under diversity jurisdiction, applied § 261 to hold a bank (that had no knowledge of employee theft) liable for the bank employee's actions because the bank put the employee in a position to commit the fraud in question. Am. Bankers Life Assur. Co. of Fla. v. Tri City Bank & Tr. Co., 677 F.2d 28, 30 (6th Cir. 1982) (stating, "The nature of Bales' employment gave him access to the banking house and made the fraud possible.")

Likewise this Court, sitting in diversity jurisdiction and applying Tennessee law, applied § 262 in ruling,

> Defendants cite *Tenn. Farmers Mutual Ins.* and the Restatement of Agency, Second, for the proposition that fraudulent conduct cannot be within the scope of an agency relationship unless the agent acts, at least in part, to benefit the principal. As a supreme court decision, *Willis* controls. In addition to *Willis,* other courts hold that under Tennessee law if an agent is acting within the scope of an agency relationship commits fraud, the principal is liable even if the agent acts entirely for his own benefit. *Doane Agricultural Service, Inc. v. Coleman,* 254 F.2d 40, 43 (6th Cir.1958) (under Tennessee law, "principal is responsible for the tortious acts of his agent if he has a right to control the agent"). *See also McReynolds v. McReynolds,* 1992 WL 14127, *2, 1992 Tenn.App. LEXIS 99, *5 (Tenn.App.2002) citing Restatement of Agency (Second) § 262.
> **From the Court's prospective, Stokes's theft occurred only because the Defendants enabled him to sell securities as their registered agent. A reasonable inference is that Stokes's agent status with the Defendants aided the Defendants' presence in**

**the market place.** Stokes's duty was to complete securities transactions in accordance with securities laws and NASD rules. To that extent, the acquisition and disposition of Plaintiffs' assets were within the actual scope of Stokes's duties as the Defendants' agent. Federal courts that have held that broker-dealers are liable under principles of *respondeat superior* where their affiliated agents steal client's money.
As You Sow v. AIG Fin. Advisors, Inc., 584 F. Supp. 2d 1034, 1047 (M.D. Tenn. 2008). **Emphasis added.**

As Tennessee courts apply §§ 219(2)(d), 261, and 262 outside of the context of a Title VII case and in general employment situations, this Court should have no trouble finding that Tennessee would apply such rules in this case. Given the absence of cases holding to the contrary, an employer in Tennessee should be liable where a supervisor or owner's tortious acts against an employee are aided by the authority to terminate or reprimand an employee given to the supervisor or owner by the entity.

A number of other jurisdictions apply the doctrine to employment cases outside of Title VII. The Seventh Circuit recently ruled that Illinois' Supreme Court would adopt the equivalent of Restatement (Second) of Agency ¶ 219(2)(d) found in the Restatement (Third) of Employment Law §§ 4.03, 4.06, noting " . . . the law has moved toward holding employers vicariously liable for their supervisory employee's intentional torts committed *outside* the scope of their employment but by abusing their supervisory authority, subject to an affirmative defense." Anicich v. Home Depot U.S.A., Inc., 852 F.3d 643, 646–56 (7th Cir. 2017), as amended (Apr. 13, 2017).[4]

Moreover, in a case where a Court decided not to apply Restatement (Second) of Agency § 219(2)(d), the basis was because the provision was abandoned in Restatement (Third) of Agency. Connolly v. Roman Catholic Archbishop of Bos., No. 1782CV1126, 2019 WL 2402290, at *5 (Mass. Super. May 17, 2019). The Connolly Court, which was considering a separate issue, failed to note that the counterpart to § 219(2) in the Restatement (Third) of Agency, § 7.07, states "This

---

[4] Other courts have utilized the doctrine for employment related torts outside of Title VII claims. *See* State, Dep't of Admin. v. Schallock, 189 Ariz. 250, 258, 941 P.2d 1275, 1283 (1997); Sherman v. State Dep't of Pub. Safety, 190 A.3d 148, 154 (Del. 2018); Mahar v. StoneWood Transp., 2003 ME 63, ¶ 19, 823 A.2d 540, 545 (analyzing case under § 219(2)(d) without expressly adopting); Spurlock v. Townes, 2016-NMSC-014, 368 P.3d 1213.

section is inapplicable to an employer's liability for one employee's tortious conduct toward a fellow employee, a topic being considered by Restatement Third, Employment Law, in preparation as Restatement Third, Agency, was completed." The Restatement (Third) of Employment Law is even more critical of employers. § 4.06 states that, so long as § 4.03 applies, the employer is liable to an employee in tort (so long as workers compensation does not apply) for intentional torts of another employee such as false imprisonment, battery, and IIED. Under § 4.03, an employer is liable for the acts of a supervisor, even where the supervisor abuses or threatens to abuse his authority and such abuse is outside of the scope of employment, unless the employer can demonstrate that: 1) the employer took reasonable care to prevent and promptly correct the abuse; and 2) the employee unreasonably failed to take advantage of a preventative opportunity offered by the employer.

Here, regardless of which test is used, throughout Rositano's employment with FW Hoehn used his supervisory authority to coerce and abuse Rositano. As set forth in the Complaint, in addition to the aided in agency theory based on a supervisory position, Hoehn was able, per his version of the events to perpetrate a fraud on Rositano based upon his supervisory authority. Specifically, Rositano claims that Hoehn was seeking sex and in exchange Hoehn would get Rositano a promotion. Doc. 31, ¶¶ 192-198. And Hoehn claims they had consensual sex. Doc. 27, p. 5. However, Rositano did not receive the promotion, resulting in, based on Hoehn's claim of consent, sex by pretext/fraud. Doc. 31, ¶ 240 Thus, as Tennessee law provides multiple avenues for relief if Hoehn's acts were outside the scope of employment, Rositano's vicarious liability claims should not be dismissed.

**C. Presuming Hoehn Was Acting Within the Scope of His Employment, And Tennessee Wil Only Appy Restatement (Second) of Agency § 219(1), Rositano's Claim of Vicarious Liability Is Not Barred as a Matter of Law.**

Under Tennessee law, an employer can be held liable for the acts of an employee where the plaintiff shows, "(1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred." Gunter v. Estate of Armstrong, 600 S.W.3d 916, 923–31 (Tenn. Ct. App. 2019), appeal denied (Jan. 15, 2020). Whether an employee is acting within the scope of his employment is generally a question of fact. Id. To determine whether an act is within the scope of employment, Tennessee Courts apply the Restatement (Second) of Agency, § 228, which states:

"(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master. . . . (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master."

Tennessee uses Restatement (Second) of Agency § 229 to analyze claims under § 228,

(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the act is seriously criminal." Wallace v. Leidos Innovations Corp., 805 F. App'x 389, 392–93 (6th Cir. 2020).[5]

---

[5] See Wong-Leong v. Hawaiian Indep. Refinery, Inc., 76 Haw. 433, 435–46, 879 P.2d 538, 540–51 (1994), wherein Hawaii stretched respondeat superior to cases where the employer is aware of the employee's drinking while on the job in ruling that respondeat superior liability "may be imposed notwithstanding the fact that the foreseeable effects of the negligent actor's conduct occur outside the scope of employment," citing a number of cases for the proposition that employer sponsored

Notably FW is a strong believer of employer sponsored drinking, boasting as such even after this lawsuit was filed, and claiming that such employer sponsored drinking (duly noted as "quarantinis" helped FW get through COVID-19. [6] FW also stocked beer in its fridge, allowed Hoehn to have "Fun Fridays" at local bars, and permitted Hoehn to leave early to go to bars and drink. Doc. 31, ¶¶ 50-54, 235, 258, 259.

In applying similar requirements, the Sixth Circuit, construing Ohio law, found that an attack by a co-employee was intentional and willful, and outside the scope of employment, in part because the defendant did not condone or ratify the employee's actions (battery at work), the employee was suspended after the incident, and the handbook of the employer prohibited the use of violence or threats in the workplace. Williams v. York Int'l Corp., 63 F. App'x 808, 811–12 (6th Cir. 2003). Here, the opposite situation is presented as FW condones the use of alcohol, claims it supports employee morale, did not punish Hoehn for any of his acts, and did not have a handbook addressing any of these issues. Doc 31, ¶ 67.

Further, courts have not shied away from imposing vicarious liability arising out of sexual conduct where the tortfeasor's acts were incidental to duties that were within his job description (such as discussions of hiring and firing) that ultimately led to a rape or sexual assault. Brown v. Argenbright Sec., Inc., 782 A.2d 752 (D.C.2001); Lyon v. Carey, 533 F.2d 649 (D.C.Cir.1976).

In analyzing the above referenced factors (though ruling for the defendant on other grounds), the Tennessee Supreme Court found that a Metro Nashville employee's intentional driving of a front end loader for the purpose of instilling fear in another was within the scope of his employment because, even though there was no evidence that driving a vehicle in an intimidating manner was

---

drinking is the negligent act and respondeat superior can apply to acts later outside the scope of employment.

[6] *See* Nashville Business Journal May 22 2020 (subscribers only, slide 3).

reasonably expected by Metro: 1) at the time of the incident, the defendant was performing his job, which required him to return the front loader to Metro's property at the end of the work day, making the acts actuated, at least in part, to serve Metro, rather than purely personal interests; 2) the incident occurred during working hours; 3) the vehicle used was provided by Metro and the employee was performing an operation he was trained and directed to do by Metro; and 4) the employee's actions did not qualify as seriously criminal, i.e. a felony. Hughes v. Metro. Gov't of Nashville & Davidson Cty., 340 S.W.3d 352, 367 (Tenn. 2011). In a later case, the Tennessee Court of Appeals noted that the "distinguishing factor between intentional tortious conduct and negligent conduct is that the intentional actor has the desire to bring about the consequences that follow or the substantial certainty that they will occur, while a negligent actor does not desire to bring about the consequences which follow, nor does he or she know that they are substantially certain to occur, or believe that they will; there is merely a risk of such consequences, sufficiently great to lead a reasonable person in his or her position to anticipate them, and to guard against them." Holder v. Shelby Cty., No. W2014-01910-COA-R3CV, 2015 WL 1828015, at *5–6 (Tenn. Ct. App. Apr. 21, 2015).

Here, Rositano alleges that Hoehn is guilty of IIED and NIED due to the ongoing sexual harassment, civil battery based on the multiple instances wherein he violated her, and false imprisonment when she locked her out of her while holding her keys.

None of these claims are not "seriously criminal in nature" and all are incidental to Hoehn's role at FW, which he claimed involving hiring, firing and disciplining. For example, Tennessee Pattern Jury Instruction 8.02, Civil Battery, states battery is any intentional, unlawful, and harmful (or offensive) physical contact by one person with another person. "**The intent required for a battery is not an intent to cause harm. It is an intent to do the act that causes the harm. (emphasis added).**" While Rositano clearly alleges there was no consent and she was raped by

Hoehn, to establish rape it must be shown that the defendant, Hoehn, "knows or has reason to know at the time of the penetration that the victim did not consent." Tenn. Code Ann. § 39-15-503(a)(2). As Hoehn continuously alleges the drunken sexual encounter he had with his subordinate was consensual, there is a dispute as to whether Rositano can establish rape. However, as civil battery does not require an intent to cause harm, rather just an intent to commit the act that causes the harm, Hoehn's knowledge of Rositano's consent or lack thereof is irrelevant in establishing civil damages, though such knowledge of a lack of consent clearly plays a role in determining damages.

Likewise, for Rositano's negligent infliction of emotional distress claim, Tennessee Pattern Jury Instruction 4.36 requires the plaintiff to prove the defendant was negligent and the negligence caused a serious mental injury. The negligence standard clearly does not require a showing of intent or seriously criminal conduct.

Similarly, Rositano's claim for intentional or reckless infliction of emotional distress, per Tennessee Pattern Jury Instruction 4.35, requires Rositano to establish that: 1) Hoehn's conduct was intentional or reckless; and 2) Hoehn's conduct was so outrageous that it is not tolerated by a civilized society; and 3) the conduct caused serious mental injury to Rositano. Again, intentional infliction of emotional distress does not require a finding of underlying seriously criminal conduct.). Even if outrageous, given that Hoehn used his position at FW, including his company cell phone, his ability to terminate, hire and discipline employees, and his ability to cover for Rositano's absences, it remains a jury question whether the intentional infliction of emotional distress was incidental to his employment with FW.

As to false imprisonment, the civil tort requires "1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." <u>Coffee v. Peterbilt of Nashville, Inc.</u>, 795 S.W.2d 656, 659 (Tenn. 1990). Per Tennessee Pattern Jury Instruction 8.01, fear of the use

of force or assertion of authority is sufficient to create the restrain necessary to create a false imprisonment. This fear may be implied from all circumstances. Given that definition, this is another claim where the question is did Hoehn intend to act (he did, per the Complaint), and whether Rositano felt confined (she did). Thus, there is nothing seriously criminal regarding a civil false imprisonment claim.

Thus, as Rositano has presented sufficient evidence to state a claim that Hoehn's acts were incidental to his status s a member/owner of FW, FW's Motion to Dismiss Rositano's vicarious liability claim should be dismissed.

### D. Regardless of Whether Hoehn Was Acting Within the Scope of His Employment, Tennessee Statutory Law Pertaining to LLCs Permits a Vicarious Liability Claim Against an LLC for the Acts of a Member.

Under the Revised Limited Liability Company Act, Tenn. Code Ann. § 48-249-402(a)(1), each member of a member managed LLC " . . . is an agent of the LLC for the purpose of its business, and an act of a member . . . that is apparently for carrying on in the ordinary course the LLC's business, . . . binds the LLC, unless the member had no authority to act for the LLC in the particular matter, and the person with whom the member was dealing knew or had notice that the member lacked authority . . ." Further, under Tenn. Code Ann. § 48-249-401, "each member has equal rights in the management and conduct of the LLC's business . . ."

The Tennessee Court of Appeals analyzed the same provision in the Limited Liability Act, set forth at Tenn. Code Ann. § 48-238-103. Lascassas Land Co., LLC v. Allen, No. M201701400COAR3CV, 2018 WL 1733449, at *5–6 (Tenn. Ct. App. Apr. 10, 2018). The Court ruled that the alleged action in *Lascassas* was not binding on the LLC because the member did not have authority to act on behalf of the LLC on the matter in question and the person dealing with the member knew that the member did not have such authority. *Id.* Had the individual dealing with the

member not known that the member did not have such authority, the action would have been binding on the LLC. *Id.*

Here, Hoehn did, as an owner of the LLC, have equal rights in the management and conduct of the LLC's business. Further, Hoehn went out of his way multiple time to advise Rositano that he hired her, he was getting Rositano a promotion and was otherwise covering up for Rositano being late. Doc. 31, ¶¶ ¶¶ 61, 195, 351. Thus, as Hohen is a member of the LLC, and utilized his powers as a member of FW to harass and groom Rositano, FW's Motion to dismiss must be denied.

**IV. FW Motion to Dismiss Rositano's Constructive Discharge Claim, Count VII Fails**

FW contends, based off of an unreported 2012 decision from the Middle District of Tennessee, that constructive discharge is not a separate avenue for recovery under Title VII. *See* Seay v. Fortune Plastics, Inc., No. 3:09-CV-0605, 2012 WL 610006, at *5 (M.D. Tenn. Feb. 24, 2012). Notably, none of the cases cited by FW state that constructive discharge may not be pled, instead each notes that the claim it is a part of the overall Title VII claims. Further, in a published opinion following *Seay,* and in numerous cases citing said published opinion, constructive discharge was recognized as a claim by the Middle District of Tennessee. *See* E.E.O.C. v. Finish Line, Inc., 915 F. Supp. 2d 904, 921 (M.D. Tenn. 2013); Gustafson v. Genesco, Inc., 320 F. Supp. 3d 1032, 1044 (S.D. Iowa 2018); Powell v. New Horizons Learning Sols. Corp., No. 17-10588, 2018 WL 6571216, at *4 (E.D. Mich. Dec. 13, 2018).

To establish a claim for constructive discharge, a plaintiff must establish: 1) that Defendant deliberately created intolerable conditions, as perceived by a reasonable person; and (2) with the intention of forcing the claimants to quit and that claimants actually quit . . . both the employer's intent and the employee's objective feeling must be examined . . . (the question becomes whether)

a reasonable person in the employee's place would feel compelled to resign." E.E.O.C. v. Finish Line, Inc., 915 F. Supp. 2d 904, 920 (M.D. Tenn. 2013).

Here, given the sheer number of texts and phone calls contained in the Complaint, Hoehn created intolerable working conditions that either required Rositano to quit or that otherwise sent her to treatment for PTSD. The question of whether Hoehn deliberated crated these intolerable conditions is a question of fact for the jury. Thus, FW Motion to Dismiss Count VII must be denied.

**V. FW Motion to Dismiss Rositano's Retaliation Claim, Count VIII, Fails**

FW argues that Rositano conflates retaliation with the FMLA in her Complaint. "To establish a *prima facie* case of retaliation under the THRA, a plaintiff must show: (1) she engaged in protected activity; (2) the exercise of protected rights was known to the employer; (3) the employer took a materially adverse action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse action." Doe v. Matthew 25, Inc., 322 F. Supp. 3d 843, 853–55 (M.D. Tenn. 2018). Under Title VII, " a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII. Sexual harassment is without question an "unlawful employment practice." If an employee demands that his/her supervisor stop engaging in this unlawful practice—i.e., resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct." E.E.O.C. v. New Breed Logistics, 783 F.3d 1057, 1067–68 (6th Cir. 2015). Where an employee shows that, prior to the outright rejection of sexual advances, the supervisor had no problem with the employee's tardiness, a jury can reasonably conclude that but for a retaliatory motive the employee would not have been terminated. *Id.*

Respectfully, FW did not consider or review paragraphs 305-352 of Rositano's Second Amended Complaint. As noted therein, on July 25, 2019, Rositano finally stopped trying to tell

Hoehn she was not romantically interested in him, instead outright blaming him for the situation and noting "I'm not comfortable anymore. You've just done too much damage to me at this point." Doc. 31, ¶ 305. Later, after seeing a message from Hoehn asking to go for a walk at 4:55 pm, Rositano cleared her desk, intending to quit, and, on her way home received a call from Hoehn. Doc. 31, ¶¶ 306-308. During this phone call Rositano specifically told Hoehn that what Hoehn had done to her at the Tin Roof on May 21, 2019 (referring to the rape) was wrong. Doc. 31, ¶ 308. Hoehn, apparently still not understanding, claimed that the problem was that the sex was not romantic enough, it should have happened somewhere other than the backseat of a car. Doc. 31, ¶ 308. Hoehn even asked if Rositano was going to "blackmail" him. Doc. 31, ¶ 308. Hours after this call, Rositano, defeated by Hoehn's manipulation, texted Hoehn, confirming she had blamed him taking advantage of her by stating "I know it wasn't you and I've never said anything to anyone about anything . . . I feel so bad I even thought it was you . . . I know you're probably with your family. And I can't believe I did that. It just all built up . . ." Doc. 31, ¶ 309. Hoehn responded to these rambling, confusing text messages by stating, "Of course I want you back at work." Doc. 31, ¶ 311. After Rositano skipped work the following day, she decided to return the next Monday, to which Hoehn responded that he ] covered for Rositano and was glad she felt better. Doc. 31, ¶ 314.

After Rositano failed to go into the office that Monday, Hoehn's text message began getting more aggressive, stating he needed to "know what's going on." Doc. 31, ¶ 316. After Rositano eventually went back to work on July 30, 2019, Hoehn mentioned, on August 1, 2019, the upcoming 777 party, set for August 8, 2019. Doc. 31, ¶ 326. Rositano alleges that she did not go to work the following Monday, August 5, 2019. due to the Dayton shooting, which, while it occurred, was a false reason. Instead, Rositano had been taking more Xanax leading up to the 777 party, attempting to deal with the anxiety, stress and fear that seeing Hoehn's wife would provoke in her. Doc. 31, ¶¶

333, 336. During this week, where Rositano was absent on August 5th and 9th and late all other days, Hoehn's texts to Rositano continued to become more aggressive in tone, stating, for example, "Wow! It will be 11:30 am. We need to find ways for it to be more planned than 11:30." Doc. 31, ¶ 328. Of course, prior to Rositano's comments at the end of July, and her missing work on August 4th after clearing off her desk and leaving, Hoehn had no such concerns about Rositano's attendance and stated on a number of occasions that he had covered her for her tardiness. Doc. 31, ¶ 197. After not coming into work on August 9th, 2019, Rositano purchased a new phone, and, between August 11th 2019 and August 20th, 2019, only texted Hoehn to alert him she had a new phone. Doc. 31, ¶¶ 340-342. On August 20th, 2019, Rositano scheduled a visit with a childhood doctor. Hoehn demanded to know when she would be at work, stating "surely you can estimate when you will be in the office?" Doc. 31, ¶ 343-346. After her childhood doctor told her never to step foot in FW again, Rositano requested medical leave and was thereafter terminated. Doc. 31, ¶¶ 346-352.

FW is correct on one point – it is unlikely that taking medical leave in and of itself was the protected activity. Instead, it appears that Hoehn began retaliating, keeping track of Rositano's absences and tardiness and criticizing her heavily as such for the first time after August 5, 2019. The Complaint establishes that: 1) Rositano, on July 25, 2019, finally told Hoehn that he had acted without her consent in having sex with her; 2) Rositano thereafter missed consecutive days of work; 3) Hoehn, despite not having much, if any, interest in Rositano's absences or delays prior to August 5, 2019, began becoming much more pointed in his texts to Rositano noting that she needed to come to work and could not be late; 4) at the mention of Rositano seeing a doctor, Hoehn began badgering Rositano as to how long the appointment would take and when she would be in; and 5) on September 3, 2019, Hoehn wrote a letter of termination to Rositano, noting she was being terminated for her

"tardiness and job abandonment. Repeated tardiness and failure to notify your manager before missing your shift cause (*sic*) a ripple effect throughout the entire organization." <u>Doc. 31, ¶ 351.</u>

Thus, Rositano clearly alleges that the retaliation began after she notified her supervisor, a member/owner of FW, that she had not consented to having sex with him and that he was the one at fault and he had done too much to hurt her. Clearly this reporting, when combined with Hoehn's new interest in Rositano's presence at the workplace, sets forth sufficient facts to allege a cause of action for negligence and to open the doors to discovery to learn if Hoehn did in fact begin keeping track of Rositano's tardiness or absences in late July or early August 2019.

## VI.     FW Motion to Dismiss Rositano's Wage Violation Claim, Count X, Fails.

FW submits that Rositano does not have a common law claim to recover unpaid wages, that the language of Tenn. Code Ann. § 52-1-103 only permits the Department of Labor to proceed against a business entity for unpaid wages. This interpretation of the statute produces an absurd result as nothing in the statute permits the Department of Labor to recover the unpaid wages on behalf of the employee and therefore FW Motion to Dismiss this claim must be denied.

The statute in question sets out general rules that appear in line with the common law, that wages must be paid in appropriate intervals and that all outstanding wages must be paid at termination. A separate section of Tenn. Code Ann. § 50-2-103 states, "(i) A violation of this section is a Class B misdemeanor, punishable by a fine (between $100 and $500) . . . It shall be at the sole discretion of the commissioner to elect to proceed either civilly or criminally upon any violation of this part . . ."

In construing a statute, the Court's goal is to give effect to the intent and purpose of the General Assembly, acknowledging that the legislature knew what the law was at the time it enacted the legislation. <u>Guy v. Mut. Of Omaha Ins. Co.</u>, 79 S.W.3d 528, 536 (Tenn. 2002). A statutory

remedy may be cumulative, rather than exclusive, and in determining the exclusivity of the remedy provided by the statute the Court looks to whether the statute indicates exclusivity. *Id.*

Here, Tenn. Code Ann. § 50-2-103(i) sets forth a civil or criminal penalty, enforceable by the Department of Labor, against employers who fail to pay wages to employees in a timely fashion. Nothing in the statute addresses the employee's recovery of the wages improperly withheld by the employer. Thus, it is clear that Tenn. Code Ann. § 50-2-103 does not preempt an employee's common law right to recover unpaid wages. Whether stated as a common law breach of contract claim for failure to pay wages, or whether the statute can be used to provide a basis to establish when the payments should have been made, the employee retains a common law right to sue for unpaid wages. Thus, FW's Motion to Dismiss this case must be denied. Rositano will replead the claim solely as a breach of contract/failure to pay wages claim under the common law if this Court requires it.

## VII. FW Motion to Dismiss Rositano's Negligent Retention/Supervision Claim, Count XII, Fails.

A decision from the 7th Circuit Court of Appeals explains why this claim should proceed. Anicich v. Home Depot U.S.A., Inc., 852 F.3d 643, 655–56 (7th Cir. 2017), as amended (Apr. 13, 2017). The *Anicich* Court ruled that a dismissal of the case as a matter of law was in error, because

> The plaintiff's amended complaint is unusually detailed—much more detailed than required by Federal Rule of Civil Procedure 8. The amended complaint recounts how Cooper's behavior escalated: from private inappropriate comments and touching, to workplace retaliation, to continual harassment and monitoring, and finally to public outbursts, verbal abuse, and physical intimidation. Hearing such evidence, a reasonable jury could easily find that the employers could and should have foreseen that Cooper would take the small further step to violence. . . . We do not diminish that truth when we repeat that Alisha's story is an old story that has been told too many times. Its ending is both shocking and predictable. Alisha's family is entitled to try to prove its truth." *Id.*

Rositano submits that, similar to *Ancinch,* based on the allegations in the Complaint it is entirely reasonable for a jury to find that FW could and should have foreseen that Hoehn's

harassment, abuse and discrimination would increase and Rositano should be permitted to conduct discovery to determine exactly what other employees or members at FW knew or believed to be true and when. Thus, FW Motion to Dismiss this claim should be denied.

More generally, in Tennessee, a plaintiff may recover from the employer under a theory of negligent hiring or supervision of an employee by showing: (1) "the elements of a negligence claim" and (2) "that the employer had knowledge of the employee's unfitness for the job." Gunter v. Estate of Armstrong, 600 S.W.3d 916, 923–31 (Tenn. Ct. App. 2019), appeal denied (Jan. 15, 2020). Notably, the existence of a negligent hiring or supervision claim does not moot any claims based upon vicarious liability. *Id.* To establish negligent supervision/retention, the plaintiff must show that the employer could "foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *Id.* Further, Restatement (Second) of Torts §317 (which has not been expressly adopted in Tennessee but has been discussed on numerous occasions) makes an employer liable for an employee's conduct where the employee uses a chattel of the employer in causing the alleged harms. Satterfield v. Breeding Insulation Co., No. E2006-00903-COA-R3CV, 2007 WL 1159416, at *5 (Tenn. Ct. App. Apr. 19, 2007), aff'd sub nom. Satterfield v. Breeding Insulation Co., 266 S.W.3d 347 (Tenn. 2008). Again, in *Ancinch*, the Court stated "Both entrustment with a chattel and entrustment with supervisory authority set employees apart from the general public. Both can enable tortious conduct. In both situations, employers have the ability and incentive to consider and monitor the employees whom they are trusting and how that trust is used. Injuries caused by using a chattel and injuries caused by abusing supervisory authority both occur "by virtue of the [tortfeasor's] employment," and not because the tortfeasor and victim merely know each other through their work," supporting a claim of negligent supervision. Anicich v. Home Depot U.S.A., Inc., 852 F.3d 643, 649–50 (7th Cir.

2017), <u>as amended</u> (Apr. 13, 2017). In that vein, *Ancinch* ruled that, since Title VII bars sexual discrimination, an employer cannot argue that a court cannot impose upon the employer an obligation to fire or demote supervisors who harass employees; the law already imposes the obligation. *Id*

Here, Rositano clearly alleges sufficient facts to find that FW knew or should have known that its retention of Hoehn under the following circumstances presented a safety issue. Rositano alleges that: 1) Alex Rustioni (the 3rd on site owner), Christopher Cochran (CEO), and Hoehn all had known each other for a long time, and thus should know about any propensity to drink too much and cause trouble (<u>Doc. 31, ¶ 453</u>); 2) Alisa Serebryanaya, the individual who previously held Rositano's position, was often spoken of longingly by Hoehn, indicating this is not the first time this happened (<u>Doc. 31, ¶¶ 33, 34</u>); 3) FW generally encouraged drinking by employees at work; 4) Rositano noted Julie Kinnard, with HR, expressed concerns about "crossing any lines", in the same sentence Rositano mentioned drinking at 55 South, indicating Kinnard believed the drinking was problematic (<u>Doc. 31-1, p. 23</u>); 5) FW had no sexual harassment reporting policies in place, and generally had no employee handbook; and 6) despite the allegations in this case, and Hoehn's admission of consensual sex with an employee, no action known to Plaintiff has been taken by FW to punish Hoehn, despite the allegations, which even taken in the light most favorable to Hoehn per Hoehn's statement of the case, admit that he went out drinking with a subordinate and had sex with her. Thus, FW Motion to Dismiss this claim should be denied.

**VIII. FW Motion to Dismiss Rositano's Request to Remove the Punitive Damages Cap, Count XIII, Fails.**

FW contends that Rositano's request to remove the punitive damages cap under Tenn. Code Ann. § 29-39-104(g) must be dismissed because Hoehn's actions were outside the scope of his

employment and Rositano does not claim that FW was reckless in hiring, retaining, supervising or training Hoehn .

First, Rositano has not claimed Hoehn was acting outside the scope of his employment. *See Section II.* If Rositano prevails on this claim, FW  is vicariously liable for Hoehn's acts. Second, Rositano made a claim against FW for negligent hiring and supervision. *See Section VII.* Given FW's propensity for promoting drinking, and,  claiming that, despite this lawsuit, alcohol and "quarntinies" allowed FW to persevere during COVID-19, it certainly seems more than plausible that FW hiring and/or supervision of Hoehn is found to be reckless by a jury.

Third, as to FW authorizing, ratifying, or approving the act or omission with knowledge or conscious or reckless disregard that the act or omission may result in the loss or injury, Rositano alleges that FW culture of irresponsible drinking, lack of employee regulations, and general fly by the seat of your pants attitude (as evidenced by the prior suit in which two of FW's three on-site owners were sued for stealing clients from a prior transportation company at which they worked, Doc. 31, ¶ 416), establishes that FW authorized Hoehn to drink during business hours and while meeting with employees. It is the authorization of the drinking and general atmosphere that must be ratified with conscious or reckless disregard that the act may result in loss or injury. It is clearly a jury question as to whether FW rule free environment, coupled with employer sponsored drinking which purportedly boosts morale, resulted in the loss or injury. Therefore, Rositano requests that FW Motion to Dismiss Rositano's request to pursue a claim to remove the punitive damages cap should be denied.

## IX. FW Motion to Dismiss Rositano's Breach of Contract Claim, Count XIV, Fails.

Per Tennessee Pattern Jury Instruction 13.09, the burden of establishing waiver of a contractual right is "on the party claiming the waiver to show that the other party gave up a contract

right and did so with full and complete knowledge of the relevant facts." The waiver must be "clear, unequivocal and decisive . . ." in establishing that the party did not desire to receive the benefit intended. Collins v. Summers Hardware & Supply Co., 88 S.W.3d 192, 201 (Tenn. Ct. App. 2002). The Complaint alleges that Rositano stated that a work laptop would be more helpful than an Apple watch. Doc. 31, §=¶¶ 250, 498. This could have been a waiver if FW and/or Hoehn said "you receive an Apple watch or nothing." Per the Complaint, this is not what happened. Instead, Rositano required a laptop, as she wanted to be clear this item came from FreightWise, not Hoehn, and she did not want Hoehn to have anything else to hold over her head. Further, after requesting a laptop, FW looked for such laptop for Rositano. Doc. 31, ¶ 250. Further, as an owner of FW, a member managed LLC, Hoehn's transactions were binding on FW, unless Rositano had reason to know he had no such authority. As Hoehn had another employee, Cody Hazelwood, keep track of Rositano's progress, it is clear that his actions bind the LLC, not him personally, as he was using assets of the LLC to keep track of Rositano's progress. Thus, as Rositano did not waive her right to receive a benefit under the agreement, and the agreement is imputed to Nathan's, Rositano's breach of contract claim should not be dismissed.

### X. CONCLUSION

Rositano renews her request that each of FW's grounds to dismiss Rositano's Complaint be dismissed. Rositano's claims are clearly not precluded by the work comp act, there are numerous avenues upon which FW can be held vicariously liable and Rositano is entitled to conduct discovery, and Rositano clearly set forth claims of retaliation, constructive discharge and breach of contract.

Respectfully Submitted by,

s/Charles Michels_____
Charles Michels, BPR# 031232
Taylor, Pigue, Marchetti & Blair, PLLC
2908 Poston Avenue
Nashville, TN 37203
(615) 320-3225
cmichels@tpmblaw.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served via this Court's ECF
system to:

David L. Cooper
Law Office of David L. Cooper, P.C.
208 Third Avenue North, Suite 300
Nashville, TN 37201
Attorney for Richard Hoehn

Charles Cain
219 Third Avenue North
Franklin, TN 37064
ccain@cain-law.com
Attorney for FreightWise, LLC

This 14th day of August, 2020


s/Charles Michels_____
Charles Michels